**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Teresa R. Fullick, | No. CV-17-0051-TUC-BGM |
| Plaintiff, | |
| v. | **ORDER** |
| Nancy A. Berryhill,<br>Acting Commissioner of Social Security, | |
| Defendant. | |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 12). Defendant filed her Brief ("Response") (Doc. 13), and Plaintiff filed her Reply Brief ("Reply") (Doc. 14). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). Compl. (Doc. 1). The United States Magistrate Judge has received the written consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

## I.      BACKGROUND

### A.      *Procedural History*

On April 4, 2012, Plaintiff filed a Title II application for Social Security Disability Insurance Benefits ("DIB") alleging disability as of February 3, 2012 due to fibromyalgia syndrome, chronic fatigue syndrome, diabetes mellitus, anxiety/panic attacks, depression,

multiple neuropathies, post-traumatic stress disorder, trigeminal neuralgia, and fatigue immune deficiency syndrome. *See* Administrative Record ("AR") at 23, 110–11, 123, 143, 148. Plaintiff's date last insured is September 30, 2017. *Id.* at 21, 23, 110, 123, 275, 304. The Social Security Administration ("SSA") denied this application on November 13, 2012. *Id.* at 21, 109–21, 143–46. Plaintiff filed a request for reconsideration, and on June 6, 2013, SSA denied Plaintiff's application upon reconsideration. *Id*. at 21, 122–39, 148–50. On July 26, 2013, Plaintiff filed her request for hearing. *Id.* at 21, 151. On July 31, 2014, a hearing was held before Administrative Law Judge ("ALJ") Larry E. Johnson. AR at 21, 83–108. On November 21, 2014, the ALJ issued an unfavorable decision. *See id.* at 21. Plaintiff did not seek review of this decision, but rather requested that the case be reopened due to a potential issue regarding her name, as well as new and material evidence including treating source testimony. *Id.* at 21, 181–88, 328–31. Plaintiff's request was granted and a supplementary hearing was held before the ALJ on August 6, 2015. *Id.* at 21, 38–82, 322. On December 15, 2015, the ALJ issued a second unfavorable decision. *Id.* at 18–30. On December 22, 2015, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on December 21, 2016, review was denied.[1] AR at 1–3, 7–17. On February 2, 2017, Plaintiff filed this cause of action. Compl. (Doc. 1).

### B.    Factual History

Plaintiff was fifty-six (56) years old at the time of the first administrative hearing, fifty-seven (57) at the time of the second administrative hearing, and fifty-four (54) at the time of the alleged onset of her disability. AR at 21, 23, 77, 109–11, 122–24, 176, 206, 235, 248, 275, 304, 313, 328. Plaintiff graduated from high school. *Id.* at 109, 122, 264. Prior to her alleged disability, Plaintiff worked as a medical assistant, certified caregiver, food preparer, and security officer. *Id.* at 77, 87–91, 264, 285–91.

---

[1] On December 23, 2016, the Office of Disability Adjudication and Review granted Plaintiff's counsel's request for additional time, which was made simultaneously with the request for review. AR 7–17. The only denial of review in the record, however, is dated December 21, 2016. *Id.* at 1–3.

### 1. Plaintiff's Testimony

#### a. Administrative Hearing

##### i. July 31, 2014

At the administrative hearing, Plaintiff testified that her last position involved taking care of homebound individuals. AR at 86. Plaintiff further testified that she only worked approximately eight (8) hours per week in this position, because of her fatigue. *Id*. at 87. Plaintiff also testified that her last full-time position was as a medical assistant. *Id*. at 87–88. Plaintiff testified that she left that position due to downsizing; however, Plaintiff believes that it was actually due to her fatigue. *Id*. at 89. Plaintiff's testimony regarding her past work consistently noted issues with her energy levels and fatigue. *Id*. at 87–91.

Plaintiff testified that she is tired when she goes to bed at night, does not sleep well, and then wakes up very fatigued. AR at 93. Plaintiff further testified that she has a lot of pain. *Id*. at 93–94. Plaintiff stated that she can do household tasks for approximately fifteen (15) minutes, but then has to return to bed. *Id*. at 94. Plaintiff further stated that in order to accomplish anything, she requires constant breaks throughout the day. *Id*. Plaintiff testified that some days are better than others, and on bad days she might spend the entire day in bed. *Id*.

Plaintiff further testified that she has trouble with concentration, noting that she has trouble focusing, and indicated that her medications contribute to feeling like she is in a fog or "loopy." AR at 95. Plaintiff described her pain as a generalized, constant, dull ache in both her muscles and joints, which tends to migrate around her body. *Id*. at 96. Plaintiff stated that she also has intermittent numbness in her thighs, as well as pains in her knees, ankles, and feet. *Id*. at 96–97. Plaintiff also testified that the numbness is a result of neuropathies. *Id*. at 97–98.

Plaintiff testified that she does not have any hobbies, finds reading difficult, and cannot do any housework or exercise. *Id*. at 94–95, 100. Plaintiff further testified that she had to stop working because of the physical nature of her work coupled with her

constant fatigue.  AR at 101–02.  Plaintiff also testified that she suffers from severe anxiety/panic attacks and depression.  *Id*. at 102.

### *ii. August 6, 2015*

Plaintiff again testified that her previous employment involved lifting and moving patients.  *Id.* at 77.  Plaintiff also stated that she had only spent approximately ten (10) to fifteen (15) minutes with Consultative Examiner Jeri Hassman, M.D.  *Id.*  Plaintiff further testified that she does not believe that she was capable of working regular, eight (8) hour day from her alleged onset date of February 3, 2012.  *Id.*  Plaintiff testified that she cannot sit or stand for long periods of time, has difficulty with motivation, and has a difficult time concentrating.  AR at 78.  Plaintiff explained that these symptoms varied from day to day, with her pain levels at a three (3) one day, and an eight (8) or nine (9) the next.  *Id.*

### b. Administrative Forms

Plaintiff completed a Function Report—Adult in this matter.  AR at 277–81.  Plaintiff noted that she lived in a house with her father.  *Id.* at 277.  Plaintiff described her medical conditions as follows:

> I'm unable to stand, sit, walk for long periods of time due to aching muscles, muscle spasms in my back and feet.  Constant pain in my spine, hips, shoulders, and into my pelvis.  Problems with painful numbness front of left thigh[.] . . . My focus [and] concentration is limited which makes it extremely difficult to always comprehend and remember instructions.  I experience daily[,] unbearable fatigue along with a generalized [____].

*Id.*  Plaintiff reported her medications as Metformin and Cymbalta.  *Id.* at 278.  Plaintiff further reported weakness that limits her ability to start of finish tasks or maintain a daily routine, as well as extreme anxiety and depression which limit her social interactions.  *Id.*

Plaintiff reported that in caring for other people, she can only sometimes carry heavy bags of food or take care of others.  AR at 280.  Plaintiff further reported that she sleeps well only sometimes.  *Id.*  Plaintiff also reported that although she can reach up high or bend down low, she cannot stand for long periods of time in front of the stove or sink, and cannot lift or carry heavy, hot items.  *Id.*  Plaintiff noted that she can understand

and follow recipes or other written instructions only sometimes. *Id.* Plaintiff stated that she cannot clean more than one room at a time without resting, and cannot move furniture. *Id.* Plaintiff can use a broom, mop, or vacuum cleaner, and carry a heavy laundry basket only sometimes. AR at 280.

Plaintiff cannot sit in a car for long periods of time, or take a trip without stopping frequently to get out of the car. *Id.* Plaintiff reported that she also cannot walk for long periods of time without resting, stand in line for long periods of time, or handle lots of people around her. *Id.* Plaintiff can sometimes get up and walk again after resting just a few minutes, load heavy bags into the car, and carry heavy bags into the house and put them away. *Id.* Plaintiff also reported she cannot handle stress and can only sometimes remember to pay bills, remember her appointments, concentrate, finish things she starts, or handle changes in routine. *Id.* Plaintiff cannot use or hands for long periods of time, but can pick up and use small items sometimes. AR at 281. Plaintiff cannot do the social activities that she used to enjoy. *Id.*

Plaintiff completed a Work History Report. *Id.* at 285–91. Plaintiff listed her jobs prior to the alleged onset of his disability to include medical assistant, certified caregiver, food preparer, and security officer. *Id.* at 285. Plaintiff reported that as a medical assistant she would take patients to their assigned room, check their blood pressure, assist physicians with office procedures, call prescriptions into pharmacies, perform scheduling, obtain medical and procedure authorizations, and perform gastro patient testing. *Id.* at 286. Plaintiff further reported that this job required machines, tools, or equipment; technical knowledge or skills; and that she wrote or completed reports. AR at 286. Plaintiff also reported that she walked or stood for approximately five (5) hours per day. *Id.* Plaintiff stated that she sat for approximately three (3) hours per day, and reached, wrote, typed, or handled small objects approximately five (5) hours per day. *Id.* Plaintiff reported carrying charts and equipment from the front desk to examination rooms or between examination rooms. *Id.* Plaintiff noted that the heaviest weight she lifted was less than five (5) pounds, and this was also the amount that she frequently lifted. *Id.*

Plaintiff reported that as a certified caregiver she assisted residents with daily living tasks, including showering, dressing, incontinence care, dispensing medication, cooking, cleaning, making beds, and laundry.  AR at 287.  Plaintiff further reported that in this position she used machines, tools, or equipment; technical knowledge or skills; and wrote or completed reports.  *Id.*  Plaintiff also reported that in this position she walked, stood, or sat for approximately three (3) hours per day.  *Id.*  Plaintiff stated that she reached for approximately two (2) hours per day; estimated that she stooped, kneeled, and handled big objects for approximately one (1) hour per day; and wrote, typed, or handles small objects for approximate one-half hour per day.  *Id.*  Plaintiff indicated that she assisted residents in and out of their bed or wheelchair.  *Id.*  Plaintiff reported that the heaviest weight she lifted was 100 pounds with assistance, and she frequently lifted less than ten (10) pounds.  AR at 287.

Plaintiff reported that in another certified caregiver position she assisted residents suffering from Alzheimer's/dementia with daily living activities, including showering, dressing, using the bathroom, dispensing medication, feeding, and soothing.  *Id.* at 288.  Plaintiff described her job as requiring the use of machines, tools, or equipment; technical knowledge or skills; and writing or completing reports.  *Id.*  Plaintiff further reported the job required her to walk; stand; sit; stoop; kneel; crouch; crawl; handle both large and small objects; and reach.  *Id.*  In this position, Plaintiff regularly lifted wheelchair bound residents from their chair to bed, toilet, or chair, as well as carried food trays from the kitchen to dining areas.  *Id.*  Plaintiff reported that in this position the heaviest weight she lifted was 100 pounds, and she frequently lifted less than ten (10) pounds.  *Id.*

Plaintiff described her position as a food preparer as working in the kitchen "prepping lettuce, tomatoes, different foods to be stocked in walk-in refrigerator for fast food."  AR at 289.  Plaintiff reported that the job required her to stand; handle, grab, or grasp large objects; and reach.  *Id.* at 289.  Plaintiff reported that she carried "filled food containers and carried them to walk-in cooler."  *Id.*  Plaintiff stated that the heaviest weight she lifted, as well as frequently lifted was less than ten (10) pounds.  *Id.*

Plaintiff described her position as a security officer as ensuring the health and safety of guests and employees by responding to radio calls; walking or driving a golf cart on the property to lock and unlock buildings; and monitoring the pool area with water slides. *Id.* at 290–91. Plaintiff reported that this job required the use of machines, tools, or equipment; technical knowledge or skills; and writing or completing reports. AR at 290. Plaintiff further reported that the job required her to walk; stand; sit; climb; stoop; kneel; crouch; reach; and handle or grasp both large and small objects frequently. *Id.* Plaintiff noted that she lifted boxes from the floor to cart, lifted rattlesnakes into safety boxes, and carried the medical emergency bag from the cart to where needed. *Id.* Plaintiff estimated that the heaviest weight she lifted was approximately twenty (20) pounds, and that she frequently lifted this weight. *Id.*

On December 3, 2012, Plaintiff completed a Disability Report—Appeal. *Id.* at 294–303. Plaintiff's updated medication list included oxycodone, Lorazepam, levothyroxine, Lisinopril, metformin, Cymbalta, Nuvigil, and Vitamin D. *Id.* at 297. Plaintiff reported that because she did not have health insurance, she was unable to afford seeing her doctor on a more frequent basis, and could not see a specialist. AR at 300. Plaintiff further reported having difficulty understanding the function report, and noted that she has trouble seeing at night while driving, cannot take an entire load of laundry out of the washing machine at once, and cannot carry heavy grocery bags. *Id.* at 300, 302.

Plaintiff reported that in caring for other people, she can only sometimes take care of others. *Id.* at 302. Plaintiff further reported that she sleeps well only sometimes. *Id.* Plaintiff also reported that she cannot stand for long periods of time in front of the stove or sink, and cannot lift or carry heavy, hot items. *Id.* Plaintiff noted that she can she can reach up high or bend down low, and understand and follow recipes or other written instructions only sometimes. AR at 302. Plaintiff stated that she cannot clean more than one room at a time without resting, and cannot move furniture or carry a heavy laundry basket. *Id.* Plaintiff can use a broom, mop, or vacuum cleaner only sometimes. *Id.*

Plaintiff cannot sit in a car for long periods of time, or take a trip without stopping frequently to get out of the car, and drives without limitation only sometimes. *Id.* Plaintiff reported that she also cannot walk for long periods of time without resting, stand in line for long periods of time, load heavy bags into the car, and carry heavy bags into the house and put them away, or handle lots of people around her. *Id.* Plaintiff can get up and walk again after resting just a few minutes only sometimes. AR at 302. Plaintiff also reported she cannot handle stress and can only sometimes remember to pay bills, remember her appointments, concentrate, finish things she starts, or handle changes in routine. *Id.* Plaintiff cannot use or hands for long periods of time, but can pick up and use small items and do her favorite hobbies sometimes. *Id.* at 303. Plaintiff cannot do the social activities that she used to enjoy, and only sometimes gets along with others. *Id.*

### 2.  Vocational Expert Tracy Young's Testimony

Ms. Tracy Young testified as a vocational expert at the administrative hearing. AR at 21, 103–05. Ms. Young described Plaintiff's past work as a nurse aid, Dictionary of Occupational Titles ("DOT") number 355.674-014, medium work, semi-skilled, and a Specific Vocational Preparation ("SVP") of 4. *Id.* at 104. Ms. Young further described Plaintiff's past work as a caregiver or home health aide, DOT number 354.377-014, medium work, semiskilled, and an SVP of 3. *Id.* Ms. Young noted that both of the jobs may be heavier than medium at times, depending upon the size of the patient for example. *Id.* Ms. Young described Plaintiff's past work of medical assistant as DOT number 079.362-010, light work, SVP of 6, and skilled. *Id.* at 105. Ms. Young testified that there were no transferable skills to sedentary work or to other light work. *Id.*

### 3.  Treating Physician Christopher Puca, M.D.'s Testimony

Christopher Puca, M.D. testified as a medical expert at the administrative hearing. AR at 21, 41–70. Dr. Puca testified that he is a board-certified internal medicine specialist, who has treated Plaintiff for several years, beginning in approximately 2009. *Id.* at 42–43, 55, 57. Dr. Puca further testified that in addition to overseeing Plaintiff's primary care and preventative medicine, he treated Plaintiff for her fibromyalgia

syndrome, chronic fatigue, trigeminal neuralgia, and low back pain, as well as her depression, Type II diabetes, hypertension, hypothyroidism, and high cholesterol. *Id.* at 43, 56–58, 60. Dr. Puca testified that most recently Plaintiff's trigeminal neuralgia had flared, and morphed into facial numbness rather than pain. *Id.* at 44. Dr. Puca further testified that this is a chronic disease. *Id.* Dr. Puca also testified that when the disease is active it can last for days to weeks, and can have cognitive and emotional effects including causing difficulties with focus, concentration, and interpersonal relationships. AR at 45. Dr. Puca opined that at its worst, trigeminal neuralgia would have a marked effect on a person's ability to function, and when the disease is at a low level, it would have a mild effect. *Id.* at 46. Dr. Puca noted that Plaintiff's various diseases vary in intensity in such a way that one is predominant over the others at any given time. *Id.* at 47.

Regarding Plaintiff's fibromyalgia, Dr. Puca testified that on June 1, 2015 he checked Plaintiff's eighteen (18) tender points, and she was positive at all eighteen (18).[2] *Id.* at 47–48, 58. Dr. Puca explained that the tender points are not the only places a person with fibromyalgia may have pain. *Id.* at 48. Dr. Puca testified that fibromyalgia is caused by a problem with neuro-processing, and that patients can have allodynia—a condition in which normally non-painful stimuli, such as touch, are experienced as pain. AR at 48, 53–54. Dr. Puca further testified that Plaintiff had been diagnosed in the 1990s with chronic fatigue syndrome, based on a positive test for the Epstein-Barr virus. *Id.* at 49–50.

Dr. Puca also noted that Plaintiff's emotional issues, including depression and post-traumatic stress disorder stem for a traumatic event in 1996, and opined that the emotional issues lasted more than a year, and could negatively impact her physical ailments. *Id.* at 60–61, 65. Dr. Puca confirmed Plaintiff's medications as including

---

[2] Dr. Puca also testified that he made an error in the record from June 1, 2015 noting twenty-four (24) out of twenty-four (24), when it should have been eighteen (18) out of eighteen (18). AR at 48. He further testified that the error may have occurred due to his automated record not working at that time. *Id.*

Synthroid, oxycodone, acetaminophen, triamcinolone, methylphenidate, lorazepam, Lisinopril, hydrochlorothiazide, and Cymbalta. *Id.* at 62–63.

Dr. Puca testified that Plaintiff does not have the stamina or energy to work an eight (8) hour day. *Id.* at 51. Dr. Puca further opined that Plaintiff would be able to stand two (2) hours or less during the work day; sit for approximately fifteen (15) to thirty (30) minutes; walk approximately one (1) block; never lift of carry ten (10) pounds; and no stooping, kneeling, crouching, or crawling due to her back problems. AR at 51–52. Dr. Puca opined that Plaintiff is not capable of maintaining even sedentary work on an eight (8) hour sustained basis. *Id.* at 52, 56, 68–69. Dr. Puca also opined that Plaintiff's combination of medical and emotional problems represent a major, negative impact on her ability to function in an employment setting. *Id.* at 62. Dr. Puca further opined that clinical psychologist Denny Peck, Ph.D.'s report represented an accurate assessment of Plaintiff. *Id.* at 63–64, 66.

### 3. Lay Witness Testimony

### a. Christopher Campbell

On July 24, 2012, Christopher Campbell, Plaintiff's brother, completed a Function Report—Adult—Third Party. AR at 282–83. Mr. Campbell reported that he spends a few hours one Saturday per month, as well as holidays with Plaintiff. *Id.* at 282. Mr. Campbell further reported that Plaintiff lives in a home with other family. *Id.* Mr. Campbell stated that when Plaintiff is not attempting to do work, she is in her recliner, bed, or somewhere else in the house, trying to get comfortable, and cannot be on her feet very much due to discomfort. *Id.*

On the same date, Mr. Campbell wrote a letter regarding Plaintiff's condition. *Id.* at 284. Mr. Campbell noted Plaintiff's health decline, indicating there are many activities that she could no longer do. AR at 284. Mr. Campbell provided examples such as walking his dog together, riding her bike, and going to the mall to people watch, as well as housework and housesitting. *Id.* Mr. Campbell noted that Plaintiff regularly suffered from low back pain and numbness in her leg and hands. *Id.* Mr. Campbell reported

seeing Plaintiff skip meals due to exhaustion, and have difficulty with concentration and focus. *Id.* Mr. Campbell further reported that Plaintiff cannot cope with changes in routine, and is no longer an active grandmother. *Id.*

On March 20, 2015, Mr. Campbell wrote another letter regarding Plaintiff. AR at 333–34. Mr. Campbell reiterated Plaintiff's lack of energy, the pain that she is in, her inability to concentrate, and social isolation. *Id.* at 333. Mr. Campbell reported that Plaintiff has difficulty with household tasks such as laundry, preparing meals, and washing dishes. *Id.* Mr. Campbell further reported that Plaintiff actively avoids social interactions. *Id.* at 333–34.

### b. Terence Fullick

On March 24, 2015, Plaintiff's ex-husband Terrence Fullick wrote a letter regarding Plaintiff. AR at 335. Mr. Fullick reported that before they were married, Plaintiff was a vibrant, highly motivated, young woman. *Id.* After she contracted Chronic Fatigue Syndrome, the constant fatigue overtook her, and as a result, she began to suffer depression and become angry. *Id.* Her physical and mental condition did not improve, and eventually led to dissolution of their marriage. *Id.*

### c. Brandi Comeau

On March 28, 2015, Brandi Comeau, Plaintiff's daughter, made a statement regarding Plaintiff's condition. AR at 348–49. Ms. Comeau reported seeing her mother once or twice a week, when Plaintiff had the energy. *Id.* at 348. Ms. Comeau further reported that Plaintiff is generally house bound. *Id.* Ms. Comeau observed that her mother walks very slowly, and will forget what she was going to say in the middle of a conversation. *Id.* Ms. Comeau also observed that Plaintiff barely has enough energy to eat, and will wince in pain with even a light touch. *Id.* Ms. Comeau tried to hire Plaintiff as a babysitter, but her mother could not be on time—she routinely slept through multiple alarms. AR at 348. Ms. Comeau estimated that Plaintiff's good days only occur once per month. *Id.* at 349.

. . .

#### d. Cindy Campbell

On July 28, 2015, Cindy Campbell, Plaintiff's sister-in-law, wrote a letter regarding Plaintiff. *Id.* at 353. Ms. Campbell reported that Plaintiff became suicidal after the break-up of her marriage, had health problems that Ms. Campbell did not understand which resulted in a significant weight gain. *Id.* Ms. Campbell stated that she hired Plaintiff to be a food preparer at a fast food restaurant, which Ms. Campbell supervised. *Id.* Ms. Campbell stated that despite the position being approximately twenty (20) hours per week, the work caused Plaintiff to become increasingly fatigued. AR at 353. Additionally, Plaintiff's social anxiety prevented her from being able to work in the customer service area when the store was busy. *Id.* As a result, Plaintiff resigned from the position. *Id.*

#### e. Thomas R. Campbell

On August 2, 2015, Thomas R. Campbell, another of Plaintiff's brothers, wrote a statement regarding Plaintiff's condition. *Id.* at 354. Mr. Campbell recalled Plaintiff's diagnosis of Chronic Fatigue Syndrome and "some other complicating conditions." *Id.* Mr. Campbell reported that when Plaintiff's marriage failed, she became suicidal. *Id.* Mr. Campbell also reported that Plaintiff had a negative response to a 1996 car bombing to which she was a first responder. AR at 354. Mr. Campbell described Plaintiff as taking their mother's death "very hard[,]" and their father moving her into his home, because she was not capable of managing on her own. *Id.* After their father passed, Plaintiff continued to live in the family home with their other brother Chris. *Id.* Mr. Campbell reported Plaintiff's social isolation, and another brother's opinion that Plaintiff's condition would improve if she were forced to be more active, which only resulted in Plaintiff's condition worsening. *Id.* Mr. Campbell opined that Plaintiff was not capable of having a part-time job. *Id.*

#### 4. Plaintiff's Medical Records

#### a. Treatment records

On February 23, 2009, Plaintiff was seen in urgent care due to persistent

numbness on the left side of her face, temple pain, left finger numbness, and left ear pain. AR at 532–33. Dr. David Orringer assessed atypical face pain, with the need to rule out trigeminal neuralgia. *Id.* at 533. On December 29, 2010, Plaintiff underwent a Motor Nerve Study, which showed Plaintiff had peripheral neuropathy. *Id.* at 455, 492–500.

On October 12, 2012, Plaintiff followed up with Dr. Puca regarding pain management. *Id.* at 432–34. Dr. Puca noted Plaintiff's current pain conditions as "Fibromyalgia and Trigeminal Neuralgia, lumbago with pain in sacrum and hips[,]" with most of her pain "currently from both[.]" *Id.* at 432. Plaintiff reported her functioning level as having stayed the same since her previous visit. *Id.* Dr. Puca's physical examination was generally unremarkable. AR at 433.

On January 24, 2013, Plaintiff returned to Dr. Puca for pain management. *Id.* at 429–431. Plaintiff reported her average pain level with medication as a four (4) out of ten (10). *Id.* at 429. Dr. Puca reported Plaintiff's composite activity score as eight (8) out of twenty-four (24), with Plaintiff indicating that she never performed any heavy exertion; sometimes performed mild or moderate exertion, kitchen chores, housekeeping, and out of home activities; and most times performed occupation related activities and personal care. *Id.* On February 8, 2013, Plaintiff had lab work done. *Id.* at 435.

On April 22, 2013, Plaintiff saw Dr. Puca regarding her pain management. AR at 436–39. Plaintiff reported her overall functioning to have increased since her last visit, but reported her average pain level as a six (6) out of ten (10). *Id.* at 436. Plaintiff complained of aching in arms, neck, thighs, low back, and facial pain on the left. *Id.* Plaintiff's composite activity score remained an eight (8) out of twenty-four (24). *Id.* On August 6, 2013, Plaintiff was seen by Dr. Puca, who noted that her anxiety and depression may be exacerbated by her fibromyalgia pain, and suggested behavioral health. *Id.* at 477–78.

On February 7, 2014, Plaintiff saw Dr. Puca regarding her sinus pain and was referred to an ENT specialist. AR at 517–19. Subsequently in early 2014, Plaintiff was treated for sinus issues, and in April 2014 underwent sinus surgery for removal of a

mycetoma. *Id.* at 460–66. On April 17, 2014, Plaintiff followed up with Dr. Puca regarding a postoperative syncopal episode. *Id.* at 513–16. On June 5, 2014, Plaintiff saw Dr. Puca for her chronic pain management, as well as a follow up post sinus surgery regarding which she complained of an ongoing foul smell. *Id.* at 509–12. Dr. Puca noted that the stress of the infection and surgery did not help Plaintiff's fibromyalgia and chronic fatigue syndrome pain. *Id.* at 510. On June 10, 2014, Plaintiff had x-rays of her sacroiliac joint and lumbar spine taken. AR at 473–74. Plaintiff's sacroiliac joint was unremarkable. *Id.* at 473. Plaintiff lumbosacral vertebra indicated possible mild disc height loss at L5/S1 and mild disc degeneration at T12/L1, as well as possibly L4/L5. *Id.* at 473–74. On June 24, 2014, Plaintiff followed up with Dr. Puca regarding her chronic fatigue syndrome and fibromyalgia. *Id.* at 474, 505–08. Dr. Puca reviewed the results of Plaintiff's radiographs and modified her prescription for methylphenidate. *Id.* at 474, 506.

On July 22, 2014, Dr. Puca completed a Pain and Fatigue Professional Source Data Sheet regarding Plaintiff. AR at 520–23. Dr. Puca reported Plaintiff's diagnoses of left-sided Trigeminal Neuralgia, Fibromyalgia syndrome, and Lumbago due to degenerative disc disease, as well as Chronic Fatigue Syndrome following pneumonia and confirmed by a high Epstein-Barr Virus load as evaluated by an infectious disease specialist. *Id.* at 520. Dr. Puca reported that he first became aware of these diagnoses in 2009 or 2010, and opined that Plaintiff's pain and fatigue levels were attributable to these illnesses. *Id.* at 521. Dr. Puca further opined that Plaintiff's depression and anxiety could also increase the intensity of her pain and fatigue. *Id.* Dr. Puca also opined that Plaintiff would be unable to attend work with any predictability. *Id.* Dr. Puca opined that there were no accommodations which would allow Plaintiff to be able to work full-time. AR at 522. Dr. Puca noted that Plaintiff could stand two (2) hours or less per day, but could not work an eight (8) hour day; could sit for between fifteen (15) and thirty (30) minutes before needing to change position; could walk approximately one (1) block; could never lift and carry ten (10) or more pounds; could never reach, feel, finger, handle,

grasp, kneel, stoop, or crouch; and would require the ability to lie down during the day, as well as alternate sitting and standing every hour. *Id.* at 523. Additionally, Dr. Puca noted that Plaintiff would miss work more than five (5) days per month due to her illness. *Id.*

On September 16, 2014, Plaintiff saw Dr. Puca regarding her chronic pain management, fibromyalgia, chronic fatigue syndrome, trigeminal neuralgia, low back pain, fungal sinusitis, and depression. *Id.* at 604–07. Dr. Puca noted that Plaintiff's PHQ-9 score was fourteen (14), which she attributed to physical discomfort and self-consciousness about the foul odor within her nasal passages. *Id.* at 605. Dr. Puca increased Plaintiff's duloxetine prescription to help trigeminal neuralgia and fibromyalgia pain. *Id.* at 605. On October 28, 2014, Plaintiff underwent another sinus surgery to clean her maxillary sinus and remove significant concretions. AR at 593. Throughout November 2014, Plaintiff returned to her ENT for post-surgical follow-up care. *Id.* at 594–97.

On December 15, 2014, Plaintiff returned to Dr. Puca regarding her chronic pain management, fibromyalgia and chronic fatigue syndrome, lumbago, trigeminal neuralgia, and Type 2 diabetes. *Id.* at 599–603, 639–44. Plaintiff reported an average pain level of four (4) out of ten (10), and composite activity level score of eight (8) out of twenty-four (24). AR at 639. Plaintiff further reported that she felt her activity level had increased. *Id.* Dr. Puca assessed Plaintiff's pain disability score as 21 out 50. *Id.* at 640. Dr. Puca recommended a gentle, gradual increase in exercise for reconditioning. *Id.* at 600, 642.

On March 13, 2015, Plaintiff saw Dr. Puca for pain management. *Id.* at 634–38. Plaintiff reported an average pain level of four (4) out of ten (10), and a composite activity level score of seven (7) out of twenty-four (24). *Id.* at 634. Patient reported her activity level had remained constant. *Id.* Dr. Puca assessed Plaintiff's pain disability as 45 out of 65. AR at 634–35. Dr. Puca also reported a facial rash, and noted that Plaintiff required testing for lupus. *Id.* at 636. On March 24, 2015, Plaintiff saw Dorothy Tucker, N.P. at ACP-ARS NOVA for her annual exam. *Id.* at 628–31. NP Tucker's physical examination of Plaintiff was unremarkable, and she also reviewed Plaintiff's laboratory

results.  *Id.* at 630–31.

On June 1, 2015, Plaintiff saw Dr. Puca regarding her pain management.  *Id.* at 621–27.  Plaintiff was positive for 24/24 fibromyalgia tender points.[3]  AR at 626.  Dr. Puca also suggested Plaintiff work with a psychologist and increase her exercise.  *Id.*  On July 17, 2015, Plaintiff saw Dr. Puca regarding pain management.  *Id.* at 617–20.  Plaintiff reported that her fibromyalgia and chronic fatigue syndrome were improved with decreased stress, her trigeminal neuralgia was intermittent and tended toward numbness rather than pain, and her lower back pain was currently her major pain condition.  *Id.* at 617.  Dr. Puca also noted that Plaintiff's focus had improved with the addition of Ritalin.  *Id.* at 617, 619.

From May 2012 through July 2013, Plaintiff was regularly seen at Catholic Social Service for behavioral health services.  AR at 561–90.

### b.  Examining physicians

#### i. Jeri Hassman, M.D.

On October 9, 2012, Jeri B. Hassman, M.D. examined Plaintiff at the request of the Arizona Department of Economic Security ("AZDES").  AR at 415–22.  Dr. Hassman noted Plaintiff's chief complaints as fibromyalgia syndrome, chronic fatigue, immunodeficiency syndrome, diabetes mellitus, anxiety, depression, neuropathies, PTSD, panic attacks, multiple neuropathies, and trigeminal neuralgia.  *Id.* at 415.  Dr. Hassman reviewed an Adult Function Report, but did not review any of Plaintiff's medical records.  *Id.* at 415–16.  Dr. Hassman noted that Plaintiff reported that there are many days when she is unable to get out of bed, and that Plaintiff also reported generalized aching pain in her neck, upper, middle, and lower back, and down both arms and legs, as well as episodes of numbness in her left anterior thigh, and episodes of trigeminal neuralgia involving the left side of her face and including low-grade aching pain.  *Id.* at 415.  Dr. Hassman's review of Plaintiff's systems noted the multiple areas of pain, as well as frequent headaches, and occasional pain in the sternum, unrelated to digestion.  *Id.* at

---

[3] Dr. Puca corrected this during his hearing testimony to 18/18.

416. Plaintiff also complained of occasional diarrhea and constipation, but no nausea or vomiting. AR at 416. Plaintiff denied any vision or hearing problems. *Id.* Plaintiff reported occasional shortness of breath, frequent depression and anxiety, frequent numbness of her fingers and toes, and some urinary frequency. *Id.* Dr. Hassman's physical examination found generalized soreness to palpation over Plaintiff's upper trapezius muscles, medial scapula, and thoracic and lumbar paraspinal muscles. *Id.* Dr. Hassman noted that although Plaintiff did not have any active tender points, she did have mild to moderate soreness/tenderness to palpation. *Id.* Dr. Hassman reported a full range of cervical spine and lumbar range of motion without pain, and negative straight leg raising test. AR at 416. Dr. Hassman further reported that Plaintiff's head and neck exam were unremarkable, without tenderness or weakness on the left side of her face. *Id.* Dr. Hassman also reported that Plaintiff had normal ambulation without complaints of pain, and could stand and walk on her toes and heels, as well as tandem walk, and hop on either foot. *Id.* Dr. Hassman noted that Plaintiff was able to bend and kneel, and was independent in dressing and undressing, getting on and off the examining table, and in and out of the chair. *Id.* at 416–17. Dr. Hassman reported Plaintiff had a full range of motion of both upper extremities without pain, and had a negative Phalen's test, negative Finkelstein's test, a negative Tinel's sign of both wrists and elbows, and normal coordination of the fingers. *Id.* at 417. Dr. Hassman noted that Plaintiff did not have any Hoffman's reflexes, had normal manual dexterity in both hands, and a negative Romberg's sign. AR at 417. Dr. Hassman reported that Plaintiff had a full range of motion of both lower extremities without pain, no crepitus or instability of the knees or ankles, and no atrophy, tenderness, or edema of her lower legs. *Id.* Dr. Hassman further reported Plaintiff's lower extremities revealed normal motor strength, sensation, and reflexes. *Id.* Dr. Hassman also reported that Plaintiff had a mild decrease in sensation of her left anterior thigh, as well as decreased sensation of her fingertips and the tips of her toes. *Id.* Dr. Hassman noted the Plaintiff cried several times during the examination without apparent reason, and upon inquiry, Plaintiff stated that she suffers from

depression. *Id.* Dr. Hassman's diagnoses included obesity, hypertension, Type 2 diabetes, anxiety and panic attacks, and fibromyalgia, chronic fatigue, immune deficiency syndrome, depression, neuropathies, and PTSD. AR at 417–18.

Dr. Hassman also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) regarding Plaintiff. *Id.* at 418–22. Dr. Hassman opined that Plaintiff could occasionally lift or carry up to fifty (50) pounds, and frequently lift or carry up to twenty-five (25) pounds. *Id.* at 419. Dr. Hassman further opined that Plaintiff did not have any limitation on standing or walking. *Id.* Dr. Hassman also found Plaintiff could sit between six (6) and eight (8) hours of an eight (8) hour day. *Id.* Dr. Hassman opined that Plaintiff was unlimited in seeing, hearing, and speaking, as well as in reaching, handling, and fingering. AR at 419–20. Dr. Hassman indicated that Plaintiff could occasionally climb ramps, stairs, ladder, rope, and scaffolds; kneel; crouch; crawl; and feel, and frequently stoop. *Id.* at 420. Dr. Hassman also noted that Plaintiff was restricted in working around heights and extremes in temperature. *Id.*

### ii. Hunter Yost, M.D.

On October 30, 2012, Hunter Yost, M.D. examined Plaintiff at the request of AZDES. *Id.* at 423–28. Dr. Yost did not review any medical records, and only reviewed a partial Function Report–Adult–Third Party filled out by her brother, as well as his July 24, 2012 typewritten statement, and Plaintiff's Function Report–Adult and Activities Questionnaire checklist. *Id.* at 423. Plaintiff reported seeing a psychiatrist, as well as a counselor, and taking Cymbalta, Nuvigil, and Lorazepam. AR at 423. Plaintiff denied suicidal ideation at the time of the examination. *Id.* Dr. Yost noted that Plaintiff described her average day as waking at approximate 7:00 a.m., but if she does not have a job assignment she will sleep all day.[4] *Id.* at 424. Dr. Yost further noted that after Plaintiff returns home from work, she will sleep the rest of the day. *Id.* In the evenings, Plaintiff stated that she may listen to the radio, watch the news, or take a brief walk, and

---

[4] During this time Plaintiff reported that she was doing home health care for approximately four (4) to eight (8) hours per week. AR at 424.

goes to bed between 8:00 and 11:00 p.m. *Id.*

Dr. Yost noted that during the examination Plaintiff maintained good eye contact and was overall pleasant and cooperative. AR at 424. Plaintiff scored twenty-nine (29) out of thirty (30) points on a Mini Mental Status Exam, could name the current and recent previous presidents, knew about local news, denied homicidal or suicidal ideation, there was no evidence of a thought disorder or hallucinations or delusions. *Id.* Dr. Yost's Axis I diagnoses included major depressive disorder, recurrent, with mild features. *Id.* Dr. Yost's Axis III diagnoses included trigeminal neuralgia, chronic widespread pain, reported diabetes, and high blood pressure. *Id.* at 425. Plaintiff's current Global Assessment of Functioning ("GAF") was 71 to 80. *Id.* Dr. Yost did not note any significant cognitive deficits. AR at 425. Dr. Yost further opined that although there was a current psychological diagnosis, he did not expect the condition to continue for twelve (12) months. *Id.* at 426.

### iii. Glenn Marks, Ph.D.

On May 23, 2013, Glenn Marks, Ph.D. examined Plaintiff at the request of AZDES. *Id.* at 447–52. Dr. Marks only reviewed Dr. Yost's October 30, 2012 Disability Evaluation prior to Plaintiff's interview. *Id.* at 447. Plaintiff reported her first panic attack at the age of twenty-eight (28), and stated although it is rare that she has a panic attack on her current regimen, she does suffer from ongoing anxiety and a low tolerance for stress. *Id.* Plaintiff further reported that being overly tired or stressed results in going into "a rage." AR at 447. Plaintiff also reported depression which varies with the level of her fatigue. *Id.* at 447–48. Plaintiff also noted a decreased ability to concentrate. *Id.* at 448.

Dr. Marks noted that despite her multiple medical concerns, Plaintiff remained fully independent in her activities of daily living, although she needs to pacer herself and modify behaviors. *Id.* Dr. Marks noted that Plaintiff "presented with a dysthymic mood and a tired affect[,] [s]he walked very slowly and appeared lethargic in her movements[,] [and] . . . walked with a noticeable limp on her left side." *Id.* at 449. Dr. Marks reported

Plaintiff's thought processes were grossly intact, without evidence of cognitive difficulties. AR at 449. Dr. Marks further reported that Plaintiff scored twenty-eight (28) out of thirty (30) on the Mini Mental Status Exam. *Id.* Dr. Marks's Axis I diagnosis included anxiety disorder and mood disorder secondary to multiple medical problems, and reported Plaintiff's GAF as sixty (60) to sixty-five (65). *Id.* Dr. Marks confirmed that Plaintiff had a current psychological diagnosis; however, did not expect it to last twelve (12) continuous months from the date of the examination. *Id.* at 450.

### iv. Scott Krasner, M.D.

On May 28, 2013, Scott Krasner, M.D. examined Plaintiff at the request of AZDES. *Id.* at 440–46. Dr. Krasner reiterated Plaintiff's history of chronic fatigue syndrome and fibromyalgia. AR at 440. Plaintiff reported that she has pain throughout her body, which is exacerbated by too much activity, and occasionally reactive to weather. *Id.* Dr. Krasner noted Plaintiff's medications to include Oxycodone, Cymbalta, Lorazepam, Metformin, Lisinopril/HCTZ and L-thyroxine. *Id.* Dr. Krasner's physical examination of Plaintiff noted 18 of 18 painful points per the American College of Rheumatology, with pain points in her posterior neck, upper back, lower back, shoulders, elbows, hips, and knees, as well as moderate tenderness in the lumbar region. *Id.* at 441. Dr. Krasner further reported that Plaintiff had full range of motion in her back, but with pain. *Id.* Dr. Krasner noted that Plaintiff could walk on her heels and toes, as well as normally. AR at 441. Dr. Krasner further reported that Plaintiff could perform a deep-knee bend, but with pain. *Id.* Dr. Krasner also reported that Plaintiff had a full range of motion in her upper extremities, but also with pain. *Id.* Dr. Krasner confirmed Plaintiff's fibromyalgia diagnosis, and indicated a moderate effect on her functional capabilities. *Id.* at 441–42.

Dr. Krasner also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) regarding Plaintiff. *Id.* at 442–46. Dr. Krasner diagnosed Plaintiff with Fibromyalgia, anxiety, and depression, and indicated he expected these to impose twelve (12) continuous months of limitation. *Id.* at 442. Dr. Krasner opined that

Plaintiff could occasionally lift or carry up to fifty (50) pounds, and frequently lift or carry up to twenty-five (25) pounds. AR at 443. Dr. Krasner further opined that Plaintiff did not have any limitation on standing, walking, or sitting. *Id.* Dr. Krasner opined that Plaintiff was unlimited in seeing, hearing, and speaking, as well as in fingering and feeling. *Id.* at 443–44. Dr. Krasner indicated that Plaintiff could occasionally climb ramps, stairs, ladder, rope, and scaffolds, and frequently stoop; kneel; crouch; crawl; reach; and handle. *Id.* at 444. Dr. Krasner also opined that Plaintiff was unrestricted in working around heights; moving machinery; extremes in temperatures; chemicals; dust, fumes, or gases, and excessive noise. *Id.*

### *v. Denny Peck, Ph.D.*

On July 25, 2015, Denny L. Peck, Ph.D. provided a report regarding Plaintiff after a comprehensive evaluation including a comprehensive medical records review, and four separate clinical interviews, the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"), a Psychiatric Review Technique, Mental Work Tolerance, and World Health Organization disability assessment. AR at 645–677. Dr. Peck reported depression and anxiety, with extreme limitations in Plaintiff's activities of daily living; maintaining social functioning; maintaining concentration, persistence, or pace; and four (4) or more episodes of decompensation, each of extended duration. *Id.* at 667–68, 670. Dr. Peck further opined that Plaintiff was markedly limited in her ability to understand and remember detailed instructions; to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; complete a workday or workweek without interruptions form psychologically based symptoms; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in work setting; travel to unfamiliar places; and set realistic goals or make plans independently or others. *Id.* at 671–75.

. . .

### c. Nonexamining physicians

State agency physicians reviewed Plaintiff's medical records at both the initial level and on reconsideration. James J. Green, M.D. reviewed Plaintiff's medical records at the initial level and gave great weight to the examining physicians. *See id.* at 109–21. Dr. Green found Plaintiff to be partially credible, stating that "[m]any of her statements are out of proportion to the objective medical evidence." *Id.* at 116. Dr. Green opined that Plaintiff had the following exertional limitations: lift or carry fifty (50) pounds occasionally; lift or carry twenty-five (25) frequently; stand and/or walk for approximately six (6) hours in an eight (8) hour workday; sit with normal breaks for approximately six (6) hours in an eight (8) hour workday; and otherwise unlimited in pushing or pulling. AR at 117. Dr. Green further opined that Plaintiff's postural limitations included the ability to frequently climb ramps and stairs; balance; stoop; kneel; or crouch; and occasionally climb ladders, ropes, and scaffolds; or crawl. *Id.* Dr. Green noted that Plaintiff did not have visual or communicative limitations, but had manipulative limitations regarding limited feeling, and environmental limitations of requiring avoiding concentrated exposure to extreme cold and heat, and hazards. *Id.*

Upon reconsideration, Debra Rowse, M.D. reviewed Plaintiff's medical records. *Id.* at 122–39. Dr. Rowse's RFC was identical to that of Dr. Green, except that she did not attribute a manipulative limitation to Plaintiff. *See id.* at 134–36.

## II. STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th

Cir. 2014).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014). Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

## III. ANALYSIS

### A. *The Five-Step Evaluation*

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). This process is defined as follows: Step one asks is the claimant "doing substantial gainful activity[?]" If yes, the claimant is not disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]" If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1. If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work. If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience. If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2017, and was not engaged in substantial gainful activity since her alleged onset date of February 3, 2012. AR at 23. At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: fibromyalgia and obesity (20 CFR 404.1520(c))." *Id.* At step three, the ALJ found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526)." *Id.* at 25. Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b)." *Id.* At step four, the ALJ found that "[t]he claimant is capable of performing past relevant work as a medical assistant Dictionary of Occupational Titles (DOT) Code 070.362-010, light, skilled, SVP 6[,] [as] [t]his work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565)." *Id.* at 30. Accordingly, the ALJ determined that Plaintiff was not disabled. *Id.* at 21.

Plaintiff asserts that the ALJ erred in failing to account for Plaintiff's non-severe mental impairment in his RFC assessment; failing to find that Plaintiff's mental impairments were indeed "severe"; failing to give treating physician Christopher Puca, M.D. proper weight; failing to apply the correct legal standard regarding Plaintiff's activities of daily living; and failing to properly evaluate and consider statements and observations by third parties. Pl.'s Opening Br. (Doc. 12) at 1, 9–25.

### B. Treating Physician Opinion

Plaintiff asserts that "[s]ubstantial evidence does not support the ALJ's residual functional capacity assessment, adverse credibility finding, or step-four decision because the ALJ erroneously rejected primary care physician Dr. Puca's August 2015 testimony and other opinions." Pl.'s Opening Br. (Doc. 12) at 16 (citations omitted). Conversely, the Commissioner asserts that "the ALJ properly considered two opinions from

[Plaintiff's] treating physician dated July 2014 and August 2015 and gave them 'partial weight.'" Def.'s Response (Doc. 13) at 15.

### 1. Legal Standard

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)); *see also Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987) (citations omitted)). "The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)); *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Embrey*, 849 F.2d at 421 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Moreover, "[e]ven if a treating physician's opinion is controverted, the ALJ must provide specific, legitimate reasons for rejecting it." *Id.* (citing *Cotton*, 799 F.2d at 1408). Additionally, "[a] physician's opinion of disability 'premised to a large extent upon the claimant's own account of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.'" *Morgan*, 169 F.3d at 602 (quoting *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citations omitted)). "Similarly, an ALJ may not simply reject a treating physician's opinions on the ultimate issue of disability." *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014). "[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. §

404.1527(c)(4).

## 2. Christopher Puca, M.D.

Regarding Dr. Puca's records and opinions, the ALJ stated that "[a]ny determination as to motivation on the part of any treating physician is always a difficult process at best, but where the opinion in question seems to depart substantially from the rest of the evidence of record, as in the current case, I have found it impossible to accept Dr. Puca's opinion at face value." AR at 29.

Fibromyalgia is "a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue." *Benecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir. 2004) (citing *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech, Inc.*, 125 F.3d 794, 796 (9th Cir. 1997)). "Common symptoms . . . include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease." *Id.* at 590. "There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and 'the only symptom that discriminates between it and other diseases of a rheumatic character' multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia)[.]" *Rollins*, 261 F.3d at 855 (quoting *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)). As such, Plaintiff's physicians must rely to a large extent on her reporting to assess her level of pain.

The ALJ's dismissal of Dr. Puca's opinions "demonstrates a fundamental lack of knowledge about fibromyalgia." *Revels v. Berryhill*, 874 F.3d 648, 663 (9th Cir. 2017). "Pursuant to SSR 12-2P, tender-point examinations themselves constitute 'objective medical evidence' of fibromyalgia." *Id.* (citing SSR 12-2P at *2–3). "Moreover, the symptoms of fibromyalgia 'wax and wane,' and a person may have 'bad days and good days[,]'" and as such, looking at longitudinal records is recommended. *Id.* (citing SSR 12-2P at *6). "Moreover, a person with fibromyalgia may have 'muscle strength, sensory

functions, and reflexes [that] are normal.'" *Id.* (quoting *Rollins*, 674 F.3d at 863) (citations omitted) (alterations in original).

Dr. Puca's testimony and records show that Plaintiff was positive for 18 out of 18 tender points. AR at 47–48, 58, 626. This objective finding is consistent with examining physician Scott Krasner, M.D.'s positive finding at eighteen (18) out of eighteen (18) tender points. *Id.* at 440. The ALJ acknowledges that "Dr. Puca is a qualified expert who has treated the claimant over time, and has a longitudinal view of the claimant's impairments, symptoms, and limitations[.]" *Id.* at 28. Yet, the ALJ discounts Dr. Puca's testimony, because he finds it impossible to believe despite Dr. Puca's extensive treatment record and testimony. *Id.* at 29. This is not a legitimate reason to partially reject Dr. Puca's opinion. "The ALJ should have found it to be controlling as to the intensity, persistence, and limiting effects of [Plaintiff's] fibromyalgia." *Revels*, 874 F.3d at 665. Furthermore, because the VE testified that Plaintiff lacked transferable skills to sedentary or other light work, giving Dr. Puca's testimony controlling weight "*alone* establishes that [Plaintiff] is entitled to benefits." *Lingenfelter*, 504 F.3d at 1041 n.12 (emphasis in original).

### C. *Plaintiff's Symptoms*

#### 1. Legal standard

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). First, "a claimant who alleges disability based on subjective symptoms 'must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged[.]'" *Smolen v. Chater*, 80 F.3d 1273, 1281–82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014). Further, "the claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could

reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282 (citations omitted); *see also Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282). "[I]f the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281); *see also Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention that the "clear and convincing" requirement had been excised by prior Ninth Circuit case law). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

"Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and 'unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment.'" *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)); *see also Ghanim*, 763 F.3d at 1163. The Ninth Circuit Court of Appeals has "repeatedly warned[, however,] that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at 1016 (citations omitted). Furthermore, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Smolen*, 80 F.3d at 1287 n. 7 (citations omitted). The Ninth Circuit Court of Appeals has noted:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Garrison*, 759 F.3d at 1016 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)) (alterations in original). "While ALJs obviously must rely on examples to show why they do not believe that a claimant is credible, the data points they choose must *in fact* constitute examples of a broader development to satisfy the applicable 'clear and convincing' standard." *Id.* at 1018 (emphasis in original) (discussing mental health records specifically). "Inconsistencies between a claimant's testimony and the claimant's reported activities provide a valid reason for an adverse credibility determination. *Burrell*, 775 F.3d at 1137 (citing *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)).

## 2. ALJ findings

Here, the ALJ acknowledged the two-step process for assessing Plaintiff's symptom testimony. AR at 25. The ALJ then found "[a]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." *Id.* at 26. The ALJ went on to review the medical record concluding that "while the undersigned has no doubt that the claimant experiences symptoms to some degree, her symptoms are not so severe as to prohibit her from performing all basic work activities." *Id.* at 30.

"[T]he claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282 (citations omitted); *see also Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the

- 29 -

severity thereof.'"  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282).  "[A]n ALJ may not disregard [a claimant's testimony] solely because it is not substantiated by objective medical evidence[.]"  *Trevizo*, 871 F.3d at 679 (citations omitted).  The ALJ's finding that objective medical evidence did not support the alleged severity of the symptoms is inconsistent with Plaintiff's burden.

The ALJ is further reminded that "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication."  *Smolen*, 80 F.3d at 1287 n.7 (citations omitted); *Garrison*, 759 F.3d at 1016 (impairments that would preclude work are often consistent with doing more than spending each day in bed).  Plaintiff consistently testified about the debilitating nature of her pain, which was supported by the statements of her family members, as well as the objective findings of her treating physician.  The ALJ found that Plaintiff "is able to bathe, dress, groom, and care for her personal hygiene without assistance, and is fully independent in her activities of daily living although she needs to pace herself[,] [o]ccasionally she takes a walk outdoors for about twenty minutes[,] [s]he can prepare simple meals and feed herself[,] [s]he is able to drive[,] [s]he shops in stores and is able to carry light loads[,]" and as such cannot be completely disabled  *Id.* at 30.  In so finding, the ALJ failed to heed the Ninth Circuit Court of Appeals's warning "that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day."  *Garrison*, 759 F.3d at 1016 (citations omitted).  Plaintiff showed a medically determinable physical impairment that could reasonably be expected to produce the Plaintiff's pain, and there is no evidence of malingering, but the ALJ failed to provide clear and convincing reasons for rejecting her testimony.  *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281).

### D. Remand for Further Proceedings

"'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'" *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) (*citing Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000)). Conversely, remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke,* 379 F.3d at 593 (citations omitted). Where the test is met, "we will not remand solely to allow the ALJ to make specific findings. . . . Rather, we take the relevant testimony to be established as true and remand for an award of benefits." *Id.* (citations omitted); *see also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995). "Even if those requirements are met, though, we retain 'flexibility' in determining the appropriate remedy." *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014).

Here, the ALJ committed legal error in discounting Plaintiff's treating provider's opinion and rejecting Plaintiff's symptom testimony. The Court finds that the record is well developed, and no outstanding issues must be resolved before a determination of benefits can be made. The Court further finds that it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence properly credited. Additionally, in light of the ALJ's clear error with regard to Plaintiff's treating physician testimony and Plaintiff's symptom testimony, the Court declines to further analyze the ALJ's treatment of the lay witness testimony and Plaintiff's mental health symptoms.

## V. CONCLUSION

In light of the foregoing, the Court REVERSES the ALJ's decision and the case is

REMANDED for further proceedings consistent with this decision.

Accordingly, IT IS HEREBY ORDERED that:

1) Plaintiff's Opening Brief (Doc. 12) is GRANTED;

2) The Commissioner's decision is REVERSED and REMANDED for calculation and award of benefits. 42 U.S.C. § 405(g); and

4) The Clerk of the Court shall enter judgment, and close its file in this matter.

Dated this 26th day of March, 2018.

Honorable Bruce G. Macdonald
United States Magistrate Judge